WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Danielle Powers, | No. CV-13-00988-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Arizona Department of Corrections, | |
| Defendant. | |

Before the Court are Defendant Arizona Department of Corrections' Motion for Summary Judgment (Doc. 41), Plaintiff's Response in Opposition (Doc. 47), and Defendant's Reply (Doc. 49).  For the following reasons, Defendant's Motion will be granted.

**I.     BACKGROUND**

Plaintiff Danielle Powers formerly served as a corrections officer for Defendant Arizona Department of Corrections.  At all relevant times, Powers worked at the Department's Eyman complex in Florence, Arizona.  The Eyman complex comprises five separate units.  In March 2011, Powers rotated into the Meadows Unit.  Corrections officer Deonté Carter also worked in the Meadows Unit.  Doc. 42 at 2–3.

On August 21, 2011, the Department's EEO liaison emailed the complex's warden after overhearing Powers and a coworker discuss Carter's sexually inappropriate behavior. Doc. 48 at 28.  The next day, the warden transferred Carter to the Cook Unit and instructed

him not to work the Meadows Unit to prevent contact with Powers pending review. Subsequently, the Department ordered a fact-finding investigation to substantiate the liaison's email. *Id.*; Doc. 42 at 4. On October 28, 2011, the Department suspended Carter for 40 hours leave without pay. The Department provided its reasons by letter:

> Two female staff members reported independently that in 2011, on several occasions, you had encroached on their personal space and touched them.
> On one occasion you sat in very close proximity to a female staff member when you reached out and touched her hand with your hand. On another occasion, it was reported by the same staff member that while she was trying to pass an inmate ID card through the center fence, you reached through the fence gap and stroked her arm with both your hands from the elbow to her hand.
> Another female officer reported that while engaged in a conversation with her you reached over and rubbed her knee and she told you to stop. This same officer reports that you then attempted to rub her shoulders and again was told to stop. You replied something to the effect "are you afraid you might like it?" It was also reported that while assigned at Mt. Vista hospital, you approached this same female staff member and suddenly embraced her. Once again, you were told to stop. This was witnessed by another staff member as well. You also engaged in persistent unwanted/unsolicited conversations with this female staff member regarding personal and sexual topics. You also sent unsolicited te[x]t messages to this female staff member.
> Your behavior constitutes insubordination, violation of standards of conduct for State employees.

Doc. 42-1 at 88–89. This letter was subsequently rescinded and replaced with a December 12, 2011 letter reducing Carter's suspension to 24 hours leave without pay and including the following justification for the discipline:

> On August 21, 2011 a complaint was filed that you had conducted yourself unprofessionally with female staff. You admitted that while assigned at Mt. Vista hospital, you approached a female staff member and suddenly embraced her. You were told to stop. This was witnessed by another staff member as well. You also engaged in persistent unwanted/unsolicited conversations with this female staff member regarding personal and sexual topics. You also sent unsolicited text messages to this female staff member. Your behavior constitutes insubordination, conduct unbecoming an employee of the Department not described elsewhere in the Department Order, rule or statute.

1    *Id.* at 91.

2         Although the parties dispute his motives, they agree Carter's objectionable behavior

3    stopped.  *Compare* Doc. 42 at 5 *with* Doc. 48 at 8.  Carter remained stationed in the Cook

4    Unit, but he occasionally worked the Meadows Unit for overtime and cross-level shifts.

5    Doc. 42 at 6.  An employee serves "cross-level" duty when he alleviates an officer shortage

6    in another unit.  *Id.* at 6 n.1.  Carter and Powers never worked the same shift at the Meadows

7    Unit.  Nonetheless, their paths sometimes crossed during a 15-minute overlap between shift

8    changes.  Powers testified she saw Carter at the Meadows Unit between three and five times

9    following the investigation.  Doc. 42-1 at 52–53.  She testified Carter never made any

10   attempt to contact her at work.  *Id.* at 53.  Indeed, Powers concedes the two never had any

11   contact after August 21, 2011.  *Compare* Doc. 42 at 6 *with* Doc. 48 at 8.

12        Powers proffers a declaration in which she elaborates on the schedule changes.

13   Although she acknowledges estimating in her deposition testimony that she saw Carter

14   "three or four times from November 2011 to May 2012," she subsequently reviewed her time

15   sheets and Carter's calendar.  From this, she determined Carter "worked in the Meadows

16   Unit, either on overtime graveyard shift or cross-level, more than 25 times from December

17   2011 through May 2012, and that of those 25 times, his shift overlapped with mine 13 times,

18   including one time he was scheduled to relieve me of duty on the next shift."  Doc. 48-1 at

19   11.  Powers states she "avoided [Carter] on those shifts."  Doc. 48 at 8.  She did not indicate

20   whether they saw each other, but it is undisputed they had no contact.

21        Powers perceived changes in her coworkers' attitudes toward her after the

22   investigation.  She testified that in particular African American officers—like Carter—

23   treated her differently.  When asked to provide an example, Powers responded that

24   coworkers avoided working with her: "In briefing one day, when post assignments were

25   called, they switched posts, so I would presume that's why."  Doc. 42-1 at 54.  When pressed

26   to described other officers' behavior, she stated "mainly it's either the avoidance or

27   switching posts, or if you're going to a transport run with someone, you would get—they can

28

switch you out saying they can't go that day or rather go with someone else or whatever excuses come up." *Id.* at 55.

Additionally, Powers learned someone described her as "being a prude, being a snob, being stuck up," *id.* at 56, as well as "playing hard to get, a tease, a tight ass." Doc. 48-1 at 5. She proffers several declarations of coworkers, who acknowledge hearing these statements from third-parties.[1]   Although Powers never heard Carter make these comments, she presumed they began with him: "My perception, my belief is that Carter started it because it never happened before, so that's my belief." Doc. 42-1 at 56.

Powers also perceived changes among the inmates.  She testified,

> the African American inmates would give me a harder time.  What I mean by that is if I asked them to do something, they would blatantly disregard what they were asked to do.  They would congregate outside of the building I was assigned to versus before I never noticed that the same way. . . . They were obviously, when I say obvious, meaning blatantly more, outwardly disrespectful.  Simple rules, they would just disobey them.   Then when redirected, just ignore it.

*Id.* at 55.  Powers learned Carter had described her to an inmate as a rat and "a prude who really wanted him, and was playing hard to get."[2] Doc. 48-1 at 5.

Powers complained to her supervisors about Carter's "constant potential presence" in the Meadows Unit and about the other inmates' and officers' comments.  She discussed these issues with the complex's deputy warden, Edwin Lao.  Sometime between August and November 2011, Powers saw Lao in the parking lot and informed him that she did not want Carter in the Meadows Unit.  *Id.* at 49.  Lao did not recall this.  *Id.* at 137.  Subsequently, Powers met with Lao in his office and informed him that she "was upset because [Carter] was still coming back into the unit."  *Id.* at 50.  Lao did not recall discussing Carter in this meeting.  *Id.* at 137.  Finally, sometime in December 2011 or January 2012, she met with

---

[1] Powers acknowledged that "[n]obody ever said them to my face. . . . It was all through others."  Doc. 48-1 at 49.  As discussed below, the relevant statements constitute inadmissible hearsay.  Powers's deposition testimony suggests that these third parties in fact relayed these comments from some other, unnamed source.  *See id.*

[2] These statements are also inadmissible hearsay.

1    Lao again and informed him of the other inmates' and officers' negative comments. *Id.* at

2    50.

3          Powers also complained to the assistant deputy warden, Theresa Hetmer, that Carter

4    remained in the Meadows Unit despite her conversations with Lao. *Id.*  Powers contacted

5    the Department's central office on Hetmer's advice but was redirected to unit management.

6    Hetmer did not recall providing such advice.  Hetmer corroborated that Powers believed

7    Carter was not allowed back in the Meadows Unit because there had been a complaint.[3]

8    Hetmer recalled Powers saying she and Carter had "crossed paths" and that this distressed

9    her.  Hetmer thought this could have been in January or February 2012.  She also

10   acknowledged this was sufficient to put the unit on notice that Carter's presence in the

11   Meadows Unit upset Powers.  Doc. 48-1 at 150.  Despite her complaints to Lao and Hetmer,

12   the parties do not dispute that Powers never complained to the warden or the EEOC liaison

13   about these post-investigation concerns. *Compare* Doc. 42 at 7 *with* Doc. 48 at 9.

14         In April or May 2012, Powers received a job offer with another employer.  She gave

15   notice and served her last day on May 12, 2012.  The parties dispute her motivation for

16   leaving.  Powers submitted to an exit interview the day before she left.  Doc. 48 at 36–37.

17   The exit form itself, which Hetmer completed during the interview, indicates Powers

18   resigned to pursue a career in clinical psychology.[4]  Indeed, Hetmer recorded that Powers's

19   "[r]esignation is not a result of any concerns.  All concerns during tenure of the Department

20   were adequately [a]ddressed."  Doc. 42-1 at 135.  Finally Hetmer noted, "If there is

21   employment opportunity Master Level Treatment Therapist position available that does not

22   require license employee would stay." *Id.*

23   _____

24       [3] Powers did not offer any evidence to support this belief.  In contrast, Lao
testified that the only instruction he ever received regarding Carter's placement was

25   reassignment "while this inquiry was still going on."  Doc. 48-1 at 135.  He testified that
Carter's reassignment was for the duration of the administrative inquiry: "Our purpose

26   for separating the complainant and the principal is to avoid tainting the investigation
itself.  There is no further action after the adjudication of this." *Id.* at 138.  Similarly, Lao

27   testified that the Department never ordered Carter to stay away from Powers
permanently. *Id.* at 145.

28       [4] In fact, Powers had been taking doctoral classes in psychology since 2008 and
completed the data review for her dissertation on May 11, 2012. *Id.* at 35.

1      Powers offers a different interpretation of the exit interview.  She testified that she

2  expressed frustration to Hetmer about the Department's response to her concerns:

> 3  And then she asked me why I was leaving, and I told her that I was frustrated with the situation about—and I did emphasize, I'm not blaming you as a
> 4  person.  I'm blaming the situation, the company for not handling it, for the fact that I got the runaround, I went to you guys, I tried what I believed at the time
> 5  to be the right thing.  I went to the highest—in my opinion the highest person
> 6  of our unit, and I felt that it just wasn't taken seriously.

7  Doc. 48-1 at 53.  Powers further stated Hetmer "was writing down—there was a point when

8  she did rip that [exit interview form] up.  I asked her why.  She said she made a mistake.  I

9  don't know what she had written."  *Id.*  Hetmer did not recall discussing the Department's

10  response to complaints about Carter or discarding any form during the interview.  She

11  testified Powers did not express disappointment or frustration over the Department's

12  response to her concerns.  *Id.* at 151.

13      In December 2012 Powers filed an EEOC charge of discrimination against the

14  Department.  After exhausting her administrative remedies, she filed a complaint in May

15  2013 alleging sex discrimination and retaliation in violation of Title VII.  The Department

16  subsequently sought summary judgment.  After the Department filed its motion, Powers

17  stipulated to dismiss her sex discrimination claim (Doc. 43).  Only her retaliation claim

18  remains.

19

20  **II.**    **LEGAL STANDARD**

21      A motion for summary judgment tests whether the opposing party has sufficient

22  evidence to merit a trial.  At its core it questions whether sufficient evidence exists from

23  which a reasonable jury could find in favor of the party opposing the motion.  Summary

24  judgment should be granted if the evidence reveals no genuine dispute about any material

25  fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

26      A material fact is one that might affect the outcome of the suit under the governing

27  law, and a factual issue is genuine "if the evidence is such that a reasonable jury could return

28  a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  The nonmoving party must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The Court must view the evidence in the light most favorable to the nonmoving party, must not weigh the evidence or assess its credibility, and must draw all justifiable inferences in favor of the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255.  Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  *Matsushita*, 475 U.S. at 587.

## III.    ANALYSIS

This case presents some conceptual difficulty because Powers attempts to use a retaliation theory to challenge the adequacy of the Department's harassment remedies.  Title VII of the 1964 Civil Rights Act prohibits sex discrimination that manifests as sexual harassment, including behavior that subjects employees to "a discriminatorily hostile or abusive environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986) ("[A] claim of 'hostile environment' sex discrimination is actionable under Title VII.").  As noted above, however, Powers has abandoned her sex discrimination claim.

Title VII also proscribes retaliation.  It "prohibits an employer from discriminating against an employee or job applicant because that individual opposed any practice made unlawful by Title VII or made a charge, testified, assisted, or participated in a Title VII proceeding or investigation."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (alterations and quotation marks omitted).  And it extends employer liability to discrimination "for co-worker retaliation that rises to the level of an adverse employment action."  *Fielder v. UAL Corp.*, 218 F.3d 973, 985 (9th Cir. 2000), *vacated on other grounds*, 536 U.S. 919 (2002).

1    In her briefing, Powers largely criticizes the Department's remedial efforts. Without

2    more, this does not advance her remaining claim for retaliation. Whether an employer

3    adequately remedies sexual harassment goes to its liability for sex discrimination. *See*

4    *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 875 (9th Cir. 2001) ("Once an employer

5    knows or should know of co-worker harassment, a remedial obligation kicks in. An

6    employer is liable for the hostile work environment created by a co-worker unless the

7    employer . . . takes adequate remedial measures in order to avoid liability.") (alterations,

8    citation, and quotation marks omitted). Powers has not offered authority for the proposition

9    that an inadequate remedy alone also establishes actionable retaliation. Indeed, the case

10   discussions to which she cites on this point involve claims for discrimination, not retaliation.

11   *See Yamaguchi v. U.S. Dep't of the Air Force*, 109 F.3d 1475, 1483 (9th Cir. 1997)

12   (affirming denial of summary judgment on employer liability for sex discrimination because

13   of material facts going to adequacy of employer's remedies); *Swenson v. Potter*, 271 F.3d

14   1184, 1192 (9th Cir. 2001) (evaluating employer's remedial action in response to

15   discrimination claim); *Fuller v. City of Oakland*, 47 F.3d 1522, 1528 (9th Cir. 1995) (same);

16   *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991) (same); *Erickson v. Wis. Dep't of Corr.*,

17   469 F.3d 600, 608 (7th Cir. 2006) (same); *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321,

18   343 (6th Cir. 2008) (discussing affirmative steps employers can take to avoid liability for

19   coworker sexual harassment).

20   Powers must demonstrate retaliation, not just an inadequate remedy to the underlying

21   harassment. "To make out a prima facie case of retaliation, an employee must show that (1)

22   he engaged in a protected activity; (2) his employer subjected him to an adverse employment

23   action; and (3) a causal link exists between the protected activity and the adverse action."

24   *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). The Department concedes that

25   Powers engaged in protected activity but contests that she suffered any consequential adverse

26   employment action. Doc. 41 at 11.

27

28

### A.   Adverse employment action

Title VII protects employees "from retaliation that produces an injury or harm." *White*, 548 U.S. at 67.  The challenged action must be "materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 68 (quotation marks omitted).  "[O]nly non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation."  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (citing *Ray*, 217 F.3d at 1243).  "Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion."  *Id.*  Similarly, the transfer of job duties, *see Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987), lateral transfers, *Ray*, 217 F.3d at 1241, and the initiation of administrative inquiries may suffice.  *See Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2007).  On the other hand, "declining to hold a job open for an employee and badmouthing an employee outside the job reference context do not constitute adverse employment actions."  *Brooks*, 229 F.3d at 928–29.  Similarly, "mere ostracism by co-workers" is insufficient.  *Ray*, 217 F.3d at 1241.

Powers concedes that, following the August 21, 2011 initiation of Carter's EEO investigation, the Department never disciplined her, changed her schedule, negatively reviewed her, denied her annual leave, cut her pay, demoted her, denied her a promotion, or transferred her.  Instead, she argues that allowing Carter to work the Meadows Unit (1) created a hostile environment which (2) led to her constructive discharge—both adverse employment actions.  Her arguments are meritless.

### 1.   Hostile work environment

Fostering a hostile work environment can constitute the adverse employment action necessary to support a retaliation claim.  Just as an employer who facilitates a hostile work environment may be liable for discrimination under Title VII, "an employer may be liable for

a retaliation-based hostile work environment." *Ray*, 217 F.3d at 1245.   As in the discrimination context, however, retaliatory harassment is actionable only if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Harris*, 510 U.S. at 21).

There are subjective and objective components to this standard.   Whether an environment is objectively hostile or abusive is not "a mathematically precise test," *Harris*, 510 U.S. at 22, but such a determination can be made "only by looking at all the circumstances.   These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.   "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *Nichols*, 256 F.3d at 872 (quotation marks omitted).   Abusive, humiliating, or threatening sexual conduct is sufficient, *see Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1056 (9th Cir. 2007), while "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not enough "to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and quotation marks omitted).   Powers offers two manifestations of the hostile work environment: (1) "the failure of [the Department] to separate Carter from plaintiff (a COII Carter-free workplace) and the retaliation she suffered from COII Carter with his continued access to the Meadows Unit and [(2)] his retaliatory inflammatory comments about plaintiff to inmates and co-workers." Doc. 48 at 9.

### a.   Threat of potential presence

First, Powers argues that because she never knew when Carter would be working the Meadows Unit, she reasonably experienced anxiety and "had to take steps to avoid contact and requested male [coworkers] to escort her at work as protection."   Doc. 47 at 15. Powers's statement of facts best captures her theory:

1
2
3
4
5

> The threat of *potential* interactions, *potential* and actual crossing of paths, the fact that COII Carter was in the [Meadows] Unit, working the Control Room when their shifts overlapped, and visual sitting of him at the scanner in the control room[5] was intimidating to plaintiff and caused her distress and fear. . . . Carter's presence *and potential presence* in the unit caused plaintiff a great deal of personal stress and strain on her interpersonal relationships.

6
7
8
9

Doc. 48 at 31 (emphasis added).  Similarly, Powers asserts, "*If* plaintiff went to work during the 15 minute overlap with Carter's overtime shift, she *could* come in contact with him in the control room while going through security where she *could* be subject to sexually abusive comments and contact." Doc. 47 at 15 (emphasis added).

10
11
12
13
14
15
16
17
18
19
20

Powers's fear of *potential* interaction lays bare the inescapable conclusion the evidence compels: On these facts, no reasonable juror could find an objectively hostile work environment despite Powers's subjective fears.  The Department's remedial efforts largely kept Carter away from Powers.   After August 2011 when the Department began its investigation, Carter never initiated *any* contact with Powers.   The two never had any physical contact, Powers saw him only three or four times, and their shifts overlapped only thirteen times.  There is no evidence of abusive, humiliating, or threatening sexual conduct. *See Craig*, 496 F.3d at 1056.   Even resolving all factual disputes in her favor, Powers has not offered evidence that Carter directed at Powers even "mere offensive utterances," *Harris*, 510 U.S. at 23, "simple teasing," or "offhand comments," *Faragher*, 524 U.S. at 788, let alone any actionable conduct.

21
22
23

Although "in some cases the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment," *Ellison*, 924 F.2d at 883, the evidence here does not support such a finding.  Even assuming

24
25
26
27
28

---

[5] Powers explains this: "When Carter worked overtime graveyard in Meadows Unit, during the 15-minute overlap of plaintiff and Carter's shift changes, COII Carter often operated the scanner, which is located at the entrance of the prison, and is a post that all staff, including plaintiff, had to go through to enter the unit.  This post required COII Carter to search through all staff, including plaintiff's personal belongings.  When a staff member could not clear the scanner due to underwire bra or metal implant, etc., post-orders required COII Carter to use a hand want to clear the corrections officer." Doc. 47 at 5–6.  Powers did not offer evidence that Carter ever used the hand wand on her after the investigation.

1   Powers saw Carter multiple times between August 2011 and May 2012, this alone is

2   insufficient to establish an objectively abusive work environment.  *See Swenson*, 271 F.3d at

3   1190 (finding no hostile work environment where victim's contact with her harasser

4   constituted sixteen sightings over a fourteen-month period, even assuming victim "may have

5   been particularly sensitive to contact" with harasser); *Fuller*, 47 F.3d at 1528 (finding no

6   hostile work environment during period when contact between victim and her supervisor-

7   harasser was routine despite finding earlier conduct sufficiently severe and pervasive to

8   violate Title VII).  Powers has not offered evidence that Carter's conduct was sufficiently

9   severe or pervasive to create a hostile work environment; therefore, his "presence and

10  potential presence" cannot constitute an adverse employment action for purposes of

11  establishing retaliation.

12

13              b.      Comments and attitudes

14          Second, Powers asserts Carter's negative remarks about her to coworkers and inmates

15  prompted them to perceive her as a snitch.  Doc. 47 at 15.  This in turn caused her coworkers

16  to avoid her and created a dangerous and abusive workplace.

17          This theory fails for two reasons.  First, Powers does not offer any admissible

18  evidence to support it.  For example, she offers her own declaration and the declaration of

19  coworker Jason Shaffer to prove statements made by inmate Cox, who in turn informed the

20  two officers about statements made by Carter.  Doc. 48-1 at 5, 19.  The statements attributed

21  to Cox, and the statements Cox attributed to Carter, are all hearsay.[6]  Powers's evidence

22  regarding Carter's statements to other officers is similarly attenuated.  Again, she offers

23  declarations: hers and that of coworker Ryan Flowers.  Each attests to statements made by

24  other officers, who in turn describe negative comments Carter made to them about Powers.

25  *Id.* at 5, 21.  Powers offers no admissible evidence that Carter ever commented about her

26  after the investigation.

27  _____

28          [6] And in any event, Shaffer's declaration states only that Carter informed Cox that
    accusations of sexual harassment were false, not that Carter made any specific comments
    about Powers.  *See* Doc. 48-1 at 19.

1        Even if she produced admissible evidence, however, her theory fails for a second

2    reason: it establishes only that Powers was subject to nonactionable ostracism.  *See Strother*

3    *v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 869 (9th Cir. 1996) (citing *Fisher v. San*

4    *Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 615, 262 Cal. Rptr. 842, 856 (Ct. App. 1989)

5    ("Ostracism, of course, does not amount to a hostile environment.")); *see also Brooks*, 229

6    F.3d at 929.  That ostracism potentially poses a threat to corrections officers not present in

7    other employment contexts, *see* Doc. 48 at 32–33, does not make it actionable or relieve

8    Powers of her burden to prove that its severity and pervasiveness created an abusive

9    environment.  The hearsay statements Powers offers are inadmissible.  But even if they were

10    admissible they do not support finding a work environment sufficiently hostile to constitute

11    an adverse employment action.

12

13                           **2.        Constructive discharge**

14        Powers also asserts the Department constructively discharged her, constituting an

15    adverse employment action.  "Under the constructive discharge doctrine, an employee's

16    reasonable decision to resign because of unendurable working conditions is assimilated to a

17    formal discharge for remedial purposes.  The inquiry is objective: Did working conditions

18    become so intolerable that a reasonable person in the employee's position would have felt

19    compelled to resign?"  *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004) (citation

20    omitted).  A sexual harassment claim premised on a constructive discharge theory requires

21    "something more," however, than demonstrating an actionably hostile work environment.

22    *See id.* at 147.  Powers "must show that the abusive working environment became so

23    intolerable that her resignation qualified as a fitting response."  *Id.* at 134; *see also Poland*,

24    494 F.3d at 1184–85.

25        Because Powers has not demonstrated a hostile work environment, she cannot prove

26    working conditions so intolerable that a reasonable person would feel compelled to resign.

27    Thus, even crediting Powers's testimony that she quit in frustration over her supervisors'

28

1    inaction, her failure to establish an abusive work environment precludes finding a
2    constructive discharge.

3

4    **B.    Causal connection**

5    Because Powers cannot prove an adverse employment action, the Court need not
6    evaluate whether any alleged adverse employment action, even if substantiated, resulted
7    from Powers's protected activity.  *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054,
8    1064–65 (9th Cir. 2002) (plaintiff must show that "but for such activity" she would not have
9    been subject to the challenged actions).   Nonetheless, a short articulation of Powers's
10   argument reinforces the extent to which she has conflated a claim for retaliation with one for
11   sexual harassment.

12   Powers asserts, "Once she reported the protected activity, [the Department] breached
13   its duty to protect her, and as a result, caused her to suffer a hostile work environment, and
14   suffer retaliation from Carter through his poisoning of the workplace with negative and
15   damaging comments to inmates and co-workers."  Doc. 47 at 17.  Putting aside her claim
16   about Carter's comments, which is not supported by any admissible evidence, Powers
17   essentially argues that the Department created a hostile work environment by immediately
18   investigating and then insufficiently punishing Carter for sexual harassment—in order to
19   dissuade other employees from reporting sexual harassment.   Her theory is inherently
20   unlikely.   That she does not offer a single fact supporting causation reinforces its
21   implausibility.

22   Thus, this discussion returns to where it began.  Powers's failure to proffer facts
23   supporting a causal connection illustrates that her real objection is to the Department's
24   response to the EEO investigation.  But an inadequate remedy, without more, does not
25   establish a claim for retaliation.  The Court is mindful of the "high standard for the granting
26   of summary judgment in employment discrimination cases."  *Schnidrig v. Columbia Mach.,*
27   *Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996).  Here, however, no rational trier of fact could find
28   for Powers on this record.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Doc. 41) is granted.

IT IS FURTHER ORDERED that the Clerk shall enter judgment for the Defendant and that Plaintiff take nothing.

Dated this 29th day of July, 2014.


_____
Neil V. Wake
United States District Judge